**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**KIRK LOURIM,**

        **Plaintiff,**

-vs-                                          **Case No. 6:05-CV-1140-ORL-KRS**

**JO ANNE B. BARNHART, Commissioner**
**of Social Security,**

        **Defendant.**

_____

**ORDER**

This cause came on for consideration without oral argument on the Complaint filed by Kirk Lourim, seeking review of the final decision of the Commissioner of Social Security terminating his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 8, 9. Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c). Doc. No. 12.

**I.    PROCEDURAL HISTORY.**

Lourim applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., (sometimes referred to herein as the Act), alleging that he became disabled on December 5, 2000. R. 67-70. His

application was denied initially and on reconsideration. He requested review of these decisions by an administrative law judge (ALJ). R. 61.

An ALJ held a hearing on April 27, 2004. Lourim, who was represented by an attorney, testified at the hearing. R. 300-18.

After considering the testimony and medical evidence in the record, the ALJ determined that Lourim was insured through the date of the decision, which was rendered on June 22, 2004. R. 32-33. He found that Lourim had not engaged in substantial gainful activity since the date he allegedly became disabled. R. 32.

The ALJ found that the medical evidence showed that between December 2000 and December 2003, Lourim had right knee arthroscopy and multiple surgeries on his Achilles tendons. Lourim's treating physician allowed him to return to light duty work after December 30, 2003. Accordingly, the ALJ concluded that between December 5, 2000, and December 31, 2003, Lourim was unable to perform full-time work and, thus, was disabled during that period. R. 31.

The ALJ concluded that Lourim's medical condition improved in relation to his ability to work after December 31, 2003. R. 31. Nevertheless, the ALJ concluded that Lourim continued to have severe impairments resulting from his knee and Achilles tendon surgeries, but that these conditions did not meet or equal an impairment listed in the SSA regulations. R. 32. Based on the assessment of Dr. Watermeier, Lourim's treating physician, the ALJ found that Lourim had the residual functional capacity (RFC) to perform the full range of light work, specifically the ability to walk/stand or sit up to six hours in an eight-hour workday, frequently lift/carry up to ten pounds, and occasionally lift/carry up to twenty pounds. R. 31,

33. In reaching the RFC determination, the ALJ also relied upon evidence that Lourim had been able to attend school on various dates in 2001 and 2002, that he worked as a Marine Engineer despite back pain, that there was no significant diagnosis or treatment for back or neck pain or for numbness in his hands, and that the numbness in his hands resolved in the morning.  R. 30.  The ALJ did not discuss the medication Lourim was taking or the side effects of such medication.

Based on this RFC, the ALJ determined that Lourim could not perform his past relevant work.  Relying solely on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, App. 2 (the Grids), the ALJ found that Lourim was not disabled.  R. 32.

Lourim requested review of the ALJ's decision. R. 19.  On May 24, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6.  The Appeals Council extended the time within which Lourim could file a civil action in this Court.  R. 5.  Lourim timely sought review of this decision by this Court.  Doc. No. 1.

**II.    JURISDICTION.**

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Lourim's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

*A. Testimony.*

Lourim was born on June 27, 1954. R. 302. He is 6'2" tall, and weighed 225 or 230 pounds at the time of the hearing. His weight had increased due to inactivity. R. 312.

He graduated from high school and attended trade school thereafter. R. 303. He worked as a Marine engineer in the Merchant Marines. R. 310.

Lourim had fallen at work three and one-half years before the hearing. During the fall, he injured his right knee and right Achilles tendon. R. 308, 312. He had surgery to repair his Achilles tendons in June 2002, March 2003, and May 2003, and he had seven surgeries in total on his lower extremities. R. 308, 313. Since he suffered the injury, he walked with crutches or a cane, although he stopped using an assistive device a few months before the hearing. R. 304-05. He suffered from back pain radiating down his legs with occasional numbness. R. 303. He was also developing arthritis in his knees following arthroscopic surgery on this right knee to repair the meniscus. R. 306.

At the time of the hearing, Lourim testified that his ankles and the bottoms of his heels hurt throughout the day. R. 304. He used gel insoles in his shoes and ankle gauntlets prescribed by his doctor for additional support. R.305.

Lourim also was experiencing numbness from his mid-forearms through his hands each morning when he awoke. R. 307. A doctor opined that this might be the result of nerve damage from use of crutches or a problem with Lourim's neck. R. 307. Lourim injured his neck in 1993. R. 314.

Lourim had a constant ache in his feet and ankles, sometimes with shooting pains around the surgery incisions. R. 314. He also had swelling in his ankles. R. 315. Due to instability in his ankles, he had difficulty climbing stairs and walking on uneven terrain. R. 315. He had fallen a few times for no apparent reason. R. 315.

He took Vicodin and Mobic for pain. R. 305. Mobic upset his stomach. Vicodin made him drowsy. He tried not to take either medication unless the pain was bad. R. 316.

In a typical day, Lourim would arise between 5:00 and 6:00 a.m., read the newspaper and watch television. During the day, he might check email on his computer. He was able to do his own cooking and cleaning and drive a car. R. 309. He did not sleep well at night, so he took naps during the day. R. 316. He estimated that he took five naps a week lasting from one-half to one hour each. R. 316-17.

Lourim testified that a doctor limited him to lifting no more than thirty pounds. Lourim estimated that he could stand for fifteen or twenty minutes, and that he might be able to walk for fifteen minutes. If he sat for too long, his ankles became stiff and hurt and his back bothered him. He estimated that he could sit one or two hours in a comfortable chair. R. 311.

    *B.    Medical Evidence.*

        1.    <u>Medical Evidence Before the Comparison Point Date.</u>

Dr. Roland Bazin began treating Lourim in September 1997 for lower left back pain. R. 191. In August 1999, Dr. Bazin also treated Lourim for headaches and neck pain. R. 186. In July 2001, Lourim began complaining of heel and leg pain, in addition to the back pain and neck aches. R. 185.

2.    Medical Evidence After Comparison Point Date.

Lourim was examined at the Tulane Medical Center Hospital and Clinic on December 6, 2000. He reported that he had injured his right knee and back during a fall. R. 126. The examining professional sought x-rays to rule out a meniscus tear in the right knee and diagnosed a sprain/contusion of the thoracic spine. He prescribed Vicodin and use of crutches. R. 127.

In January 2001, Richard Gaines, M.D., performed arthoscopic surgery on Lourim's right knee and repaired the medial meniscus. R. 128-29,132. After the surgery, Lourim had physical therapy. R. 139-50. At the conclusion of the treatment, the physical therapist noted that there had been no significant improvement in Lourim's right knee or right Achilles heel pain. As of March 2001, Lourim walked with a limp, and his strength was limited due to pain, although he had full range of motion in his right knee. R. 139. Dr. Gaines released Lourim to light duty work as of mid February 2001. R. 159. In April 2001, he restricted Lourim to no work pending further treatment. R. 154-57.

Peter E. Lowenstein, D.C., treated Lourim from June 2001 through July 2003. R. 278-90. These records reflect that Lourim complained of lower back and neck pain, as well as heel pain. *Id.*

In June 2001, J. Dean Cole, M.D., examined Lourim for continuing complaints of pain and tenderness around his right Achilles tendon and pain and swelling in his right heel area. Lourim was able to walk using a knee brace. After examination, Dr. Cole opined that Lourim suffered from chronic Achilles tendinitis. R. 152. Dr. Cole recommended exercise and physical therapy, with the possibility of surgery if Lourim's condition did not improve. R. 153.

Christfried J. Urner, M.D., examined Lourim in August 2001. Dr. Urner observed that Lourim walked with a limp. R. 164-65. Both of Lourim's ankles were tender around the Achilles tendons and Dr. Urner could feel fluid upon palpation of the area. Ankle reflexes could not be elicited. Nevertheless, Lourim had good muscle strength and motion in the extremities and back except for the limp. R. 166. Dr. Urner's assessment was bilateral Achilles tenderness, probably tendinitis. R. 167.

Michael D. Kohen, M.D., examined Lourim in August 2001. Lourim complained of ankle pain with morning stiffness and swelling. He had had right ankle surgery in 1988. Dr. Kohen observed that Lourim walked with a limp. Upon examination, Dr. Kohen observed that Lourim's right knee and both ankles were tender, with swelling in the area of the Achilles tendons, but he observed no tenderness in the area of Lourim's spine. Lourim had decreased motion in both ankles. R. 171. Dr. Kohen's assessment was inflammatory polyarthralgias. R. 170. Dr. Kohen's assessment remained the same when he examined Lourim again in October 2001. R. 169.

On October 25, 2001, Bernard Manale, M.D., performed surgery on Lourim's right Achilles tendon. R. 172. As of November 29, 2001, Lourim was still using crutches and a walker. He also continued to complain of right knee pain. R. 197. In an examination of Lourim in January 2002, Dr. Manale observed that Lourim had almost full range of motion in his ankles, although there was moderate edema. He authorized Lourim to stop using the walker and to begin physical therapy. R. 196.

In a follow-up examination in March 2002, Lourim was walking using two crutches. Surgery on Lourim's left ankle was planned. Dr. Manale continued to treat Lourim with

Percocet and Ambien. R. 193. Lourim had an additional course of physical therapy from April through December 2002. R. 233-40.

John Watermeier, M.D., began treating Lourim for heel pain sometime before April 25, 2002. R. 259. Dr. Watermeier performed surgery on Lourim's left ankle in June 2002. R. 205.

James R. Shoemaker, D.O., examined Lourim at the request of the SSA in July 2002. Upon examination, Dr. Shoemaker observed that Lourim had full range of motion in his right foot and could bear weight, but still walked with crutches. Lourim's left leg was still in a splint following surgery. Dr. Shoemaker's assessment was chronic mild disability of the left lower extremity and a permanent injury to the ligaments of the right knee per history. R. 215.

In July 2002, E. Brigety, M.D., prepared an RFC assessment based on a review of Lourim's records. Dr. Brigety opined that Lourim could lift up to ten pounds occasionally but less than ten pounds frequently. He could stand or walk about four hours per day, and sit for about six hours. His ability to push and pull was limited in his lower extremities. He could only occasionally engage in postural activities. R. 225-32.

In September 2002, Eric C. Puestow, M.D., prepared an RFC assessment based on a review of Lourim's records. Dr. Puestow opined that Lourim could lift up to twenty pounds occasionally and ten pounds frequently. He could stand or walk two to four hours a day, and sit about six hours. His ability to push and pull was limited in his lower extremities. He could only occasionally engage in postural activities and could never climb ladders, ropes and scaffolds. R. 217-24.

In a follow-up examination by Dr. Watermeier in August 2002, Lourim complained that his arms became numb at night and while holding a telephone. He complained of a grinding sensation in his right ankle and instability in his right knee. Dr. Watermeier observed mild crepitation in Lourim's right knee. R. 249.

In September 2002, Lourim reported a funny sensation on the outside of his left heel, and that his right knee was locking. He was using a walker and crutches. *Id*. On December 19, 2002, Lourim complained of pain in his left heel and soreness in his right heel. He reported that he had driven to Maryland to attend training. Upon examination, Dr. Watermeier found that Lourim had full range of motion, but some swelling. He prescribed Vicodin and recommended that Lourim continue to use crutches. R. 250.

In a deposition taken in a civil case on January 7, 2003, Dr. Watermeier testified that he had not examined Lourim since December 19, 2002. R. 250. Dr. Watermeier opined that Lourim had not reached maximum medical improvement. He indicated that Lourim would have permanent restrictions to sedentary and light activity, and that he should avoid activities that required repetitive or prolonged standing, walking, climbing, or bending due to his knee impairment. He should lift no more than forty or fifty pounds. R. 250-51, 253.

In March 2003, Dr. Watermeier again operated on Lourim's left ankle to remove hardware from the previous surgery and address an infection. R. 273-75. As of May 1, 2003, Lourim reported intermittent symptoms with mild discomfort. R. 271. However, on May 27, 2003, Lourim returned to Dr. Watermeier with pain and swelling in the left heel, which Dr. Watermeier diagnosed as cellulitis and an abscess. R. 270. Dr. Watermeier performed yet another surgery on May 29, 2003 to drain Lourim's left heel. R. 269.

In September 2003, Dr. Watermeier observed that Lourim was walking, albeit with a stiff gait and using a cane. He complained of right knee mild pain, aching, popping or clicking, and weakness. He also complained of aches in both ankles, increased with prolonged sitting or standing. Dr. Watermeier opined that Lourim must avoid repetitive or prolonged squatting, crawling, climbing, kneeling, or walking on uneven surfaces. R. 262.

Dr. Watermeier examined Lourim again on December 30, 2003. Lourim reported that his ankle symptoms had improved, although he still had mild pain and instability ("giving way") in his left ankle. R. 261. Dr. Watermeier indicated that Lourim should continue on medication with a home exercise program. He released Lourim to light duty work based on the Department of Labor, *Dictionary of Occupational Titles* (DOT/DOL). R. 261. In a letter dated January 13, 2004, Dr. Watermeier confirmed that he released Lourim to light duty work as of December 30, 2003. R. 260.

**IV.   STANDARD OF REVIEW**.

When the Commissioner determines in an initial application for disability benefits that the claimant was disabled for a specified period, but not thereafter[1], the medical improvement standard used to assess termination of disability benefits applies. *See Pickett v. Bowen*, 833 F.2d 288, 292 (11th Cir. 1987); *see also* 42 U.S.C. § 423(f); *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982).

---

[1] This is referred to as a closed period of disability.

Comparison of original medical evidence and new medical evidence is necessary to make a finding of improvement.[2] *Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir. 1984). The point of comparison is the most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether the claimant was disabled or continued to be disabled.  20 C.F.R. § 404.1594(b)(7).  In a closed period of disability case, the comparison point date is the date on which the Commissioner found that the claimant's disability began.  *Pickett*, 833 F.2d at 292 n.2.

Any determination regarding whether benefits continue must be made "on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."  42 U.S.C. § 423(f). It remains the Commissioner's duty to prove medical improvement by substantial evidence. *Id.*; *see also* 20 C.F.R. § 404.1594(a).

Pursuant to 42 U.S.C. § 405(a),  the SSA has promulgated an eight-step inquiry that must be followed in determining whether benefits may be terminated for medical improvement.  In sum, the ALJ must ask:

> (1) Is the claimant engaged in substantial gainful activity? (If so, the disability has ended.)

---

[2]   Medical improvement is assessed by review of "symptoms, signs and/or laboratory findings."  20 C.F.R.§ 404.1594(b)(1). Symptoms are the claimant's description of impairments.  20 C.F.R. § 404.1528.  Signs are observable by medically acceptable clinical diagnostic techniques.  *Id.*  Laboratory findings are from medically acceptable laboratory techniques.  *Id.*

> (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in [20 C.F.R. Part 404, Subpart P, Appendix 1]? (If so, the disability is continuing.)
>
> (3) If not, has there been medical improvement?
>
> (4) If there has been medical improvement, is it related to the claimant's ability to do work?
>
> (5) If there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable? (If not, the disability is continuing.)
>
> (6) If there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended.)
>
> (7) If so, is the claimant able to engage in past relevant work? (If so, the disability has ended.)
>
> (8) If not, is the claimant able to perform other substantial gainful activity?

*Griego v. Sullivan*, 940 F.2d 942, 944 n.1 (5th Cir. 1991) (citing 20 C.F.R. § 404.1594(f)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

**V.    ANALYSIS**.

Lourim raises many interrelated arguments. In sum, he contends that the ALJ did not properly assess his nonexertional impairments arising from pain, restrictions in postural activities, and side effects of medication. He further asserts that because he had significant limits on his ability to perform basic work activity due to nonexertional impairments, the ALJ

erred in relying on the Grids, rather than the testimony of a vocational expert. These are the only issues I will address.[3]

The ALJ appropriately relied upon the opinion of Dr. Watermeier in reaching the conclusion that Lourim could perform light work after December 31, 2003. Dr. Watermeier treated Lourim and, as such, his opinion was entitled to great weight. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Moreover, Dr. Watermeier is the only treating, consulting or reviewing physician who assessed Lourim's functional capacity after Lourim's final series of surgeries to repair problems with his Achilles tendons. Dr. Watermeier was also aware of Lourim's complaints of knee pain and was able to factor limitations arising from those limitations into his assessment.

While Dr. Watermeier testified in January 2003 that Lourim would have permanent limits on his exertional and postural abilities, including that Lourim could not engage in prolonged standing or walking, it appears that his opinion changed after Lourim reached maximum medical improvement. Dr. Watermeier specifically relied upon the *Dictionary of Occupational Titles* (DOT) definition of light work in releasing Lourim to perform light work. This definition specifically provides that "a job should be rated as Light Work: (1) when it requires walking or standing to a significant degree . . . ." *Dictionary of Occupational Titles*, App. C (4th ed. Rev. 1991), *available at* http://www.westlaw.com (directory DICOT).

The ALJ also appropriately considered Lourim's testimony about the pain and resulting limitations in function he experienced. As required in this circuit, the ALJ articulated

---

[3] The parties were advised that issues not specifically raised would be waived. Doc. No. 11 at 2.

specific and adequate reasons for finding Lourim's complaints of pain and limitations after December 31, 2003, to be not entirely credible. *See Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). The ALJ observed that Lourim had been able to attend school on various dates in 2001 and 2002, that he worked as a Marine Engineer despite back pain, that there was no significant diagnosis or treatment of back or neck pain or for numbness in his hands, and that the numbness in his hands resolved in the morning. Furthermore, Lourim expressed only mild ankle pain at his December 30, 2003, examination by Dr. Watermeier. Substantial evidence in the record, as set forth in the Statement of Facts above, supports these conclusions.

Lourim also contends that the ALJ failed to consider the side effects of his medication, particularly drowsiness. While the ALJ did not discuss Lourim's testimony in this regard, the Commissioner correctly argues that the record is clear that these side effects do not substantially limit Lourim's ability to perform basic work skills. The medical records do not reflect that Lourim complained of side effects of medication. Further, Lourim testified that he tried to avoid use of his pain medication, relying on it mostly to aid with sleep.

Finally, Lourim asserts that the ALJ erred in relying upon the Grids rather than vocational testimony in reaching the conclusion that there was work he could perform after December 31, 2003. Use of the Grids was proper in this case because the ALJ concluded that Lourim could perform a full range of work at the light level of exertion, and the evidence supports the ALJ's conclusion that Lourim did not have nonexertional impairments that significantly limited his basic work skills. *See Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004).

**VI.     CONCLUSION.**

It is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this decision and, thereafter, close the file.

**DONE** and **ORDERED** this 25th day of September, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record